**In re CANDOR DIAMOND CORP., Debtor.**

**Daniel McCOLLEY, Trustee of Candor Diamond Corp., Plaintiff,**

**v.**

**NAVARO GEM LTD., Defendant.**

Bankruptcy No. 81 B 11594.
Adv. No. 82–5589A.

United States Bankruptcy Court, S.D. New York.

Dec. 11, 1986.

See also, Bkrtcy., 21 B.R. 143, Bkrtcy., 42 B.R. 916.

Stroock & Stroock & Lavan by Jay Fial-koff, Robin E. Keller, New York City, for trustee.

Sherman, Citron & Karasik, P.C. by Howard Karasik, New York City, for Navaro Gem. Ltd.

TINA L. BROZMAN, Bankruptcy Judge.

This preference action arises out of the notorious Candor Diamond Corp. (Candor) bankruptcy. After stipulating with the defendant, Navaro Gem, Ltd. (Navaro) as to the transactions which occurred between it

and Candor, Candor's bankruptcy trustee (Trustee) rested, relying on the presumption of insolvency.[1] Navaro contends, among other things, that the Trustee has failed to carry his burden of proof on the issues of insolvency and the distribution which Navaro would have received from the bankrupt estate. For the reasons which follow, we hold that the Trustee has indeed proven that the transfers were preferences.

## FACTS

Prior to its bankruptcy, Candor had been engaged in the business of buying and selling loose gems and manufacturing and selling jewelry. On August 10, 1981, there was filed against it an involuntary petition in bankruptcy. An order for relief was entered on November 9, 1981 and Daniel McColley was later appointed as trustee. He seeks to recover from Navaro payments made by Candor to Navaro for gems which Candor purchased. At trial, the parties stipulated to the following facts:

(1) On December 3, 1980, Navaro sold and delivered gems to Candor worth $39,055, for which Navaro received fifteen promissory notes. Four of those notes were paid within the preference period, on May 13, May 19, May 28 and June 6, 1981 in the respective amounts of $3,000, $3,000, $3,000, and $3,055 (the "First Transaction").

(2) On March 27, 1981 and January 28, 1981, Navaro sold and delivered gems to Candor worth $1,536.45, for which Navaro received Candor's check dated June 4, 1981 in that amount ("the Second Transaction").

(3) On April 1, 1981, Navaro sold and delivered gems to Candor worth $61,391.75, for which Navaro received three promissory notes in the respective amounts of $22,275, $28,500 and $10,616.75. These notes were paid, respectively, on June 3, 1981, July 3, 1981, and August 3, 1981 (the "Third Transaction").

(4) On May 7, 1981, Navaro sold and delivered gems to Candor worth $8,855, for which Candor paid by check dated July 31, 1981 (the "Fourth Transaction").

Navaro admits that the payments set forth above constituted payment in full of all debts owed by Candor to Navaro.

It was at this point when the Trustee obtained Navaro's agreement that he rested. Navaro, however, called two witnesses. The first was Shane Yurman (Yurman), a certified public accountant with the firm of W.H. Freedman & Company, the former accountants for Candor. The other was Sam Navaro, Navaro's president.

Yurman testified that he supervised the preparation of a review report of Candor consisting of unaudited financial statements for the period ending November 30, 1980 (some eight and one-half months prior to the filing of the involuntary petition). The letter accompanying the financials was dated May 5, 1981. The balance sheet reflected total assets of $1,629,847 [2] and liabilities of $1,419,562. All of the information used to prepare the financial statements was derived, directly or indirectly, from Margolies and the late Margaret Barbera, Candor's bookkeeper.[3] As is standard with a review report, the accounting firm did not actually examine the inventory and did not verify the existence of the accounts receivable which, together, constituted approximately half of Candor's assets. Whatever undescribed tests were made of those assets were purely mathe-

---

**1.** The case was tried by the Hon. Edward J. Ryan, who reserved decision at the conclusion of the trial. Because he did not render a decision prior to his retirement from the bench, the parties stipulated to permit me to determine the matter on the record, waiving their right to a trial *de novo.*

**2.** Yurman testified that the assets were valued at $1,557,734.00. It appears, however, that he was

reading that line of the balance sheet which reflected "current assets."

**3.** Utilizing the same sources of information, the accounting firm also prepared a 1981 tax return for Candor, which may not have been filed with the Internal Revenue Service, reflecting the identical assets and liabilities shown on the balance sheet.

matical computations. Yurman further testified that before issuing the financial statements his firm inquired of management whether any events had occurred subsequent to November 30, 1980 which would materially affect the statements. None was revealed.

Sam Navaro testified that Candor generally paid his company with promissory notes which Navaro discounted with Bank Leumi. With the Second and Fourth Transactions, however, the practice was varied, Candor paying Navaro directly by check.

In addition to eliciting the testimony previously described, Navaro's counsel introduced into evidence six pages from the Trustee's deposition in which he testified that he had collected $718,112.58 in assets, of which $186,723.00 was in escrow pending resolution of litigation with a third party; that he had a "six million plus" claim against Margolies and his wife on which no suit had yet been brought; that Candor's factor filed a claim for $5,669,394.98 and that the other unsecured creditors have claims of under $500,000.00. The other portions of the deposition were not offered in evidence.

At the conclusion of Navaro's case, the Trustee's counsel sought to rebut Navaro's evidence by introducing Margolies' allocution in the district court at which he pleaded guilty to bankruptcy fraud. This was sought under Fed.R.Evid. 803(24), which requires that the proponent make known to the adverse party in advance of the trial the intention to use the hearsay statement.

Because counsel conceded that that notice had not been given, Judge Ryan declined to admit the allocution.

## DISCUSSION

Navaro initially challenges this court's jurisdiction to hear and determine the Trustee's action. That dispute has long been resolved in favor of jurisdiction. *See* 28 U.S.C. § 157(b)(2)(F); *In re Kaiser*, 722 F.2d 1574 (2d Cir.1983); *In re Lion Capital Group*, 44 B.R. 690 (Bankr.S.D.N.Y. 1984). We turn, therefore, to the merits of the Trustee's action.

Preliminarily, we note that the Trustee has the burden of proving by a preponderance of the evidence all of the elements rendering the transfer avoidable under 11 U.S.C. § 547.[4] *First Potter County Bank v. Hogg (In re Hogg)*, 35 B.R. 292, 294 (Bankr.D.S.D.1983); 11 U.S.C. § 547(g). Here, Navaro denied all of the elements, putting the Trustee to his proof.

### 1. TRANSFER

The Second and Fourth Transactions involved payments by check which, indisputably, constitute transfers. 11 U.S.C. § 101(40); *In re Duffy*, 3 B.R. 263, 265 (Bankr.S.D.N.Y.1980). The First and Third transactions involved satisfaction of the notes discounted by Bank Leumi. Payment of each of the notes constituted a transfer for "[i]t is well settled that it is not the mere giving of a note by the debtor to his creditor, but rather ... the payment thereof within the 90-day period [that] ef-

---

4. Under the Bankruptcy Amendments and Federal Judgeship Act of 1984 ("BAFJA"), section 547 was amended. However, this proceeding was filed before the enactment of BAFJA and is governed by section 547 as it read pre-BAFJA:

(b) Except as provided in subsection (c) of this section, the trustee may avoid a transfer of property of the debtor—
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—
(A) on or within 90 days before the date of the filing of the petition; or

(B) between 90 days before the date of the filing of the petition, if such creditor, at the time of such transfer—
(i) was an insider; and
(ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and
(5) that enables such creditor to receive more than such creditor would receive if—
(A) the case were a case under chapter 7 of this title;
(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

fects the preference." 4 L. King, *Collier on Bankruptcy* ¶ 547.15 at 547–56 n. 1 (15th ed. 1986) and cases cited therein.

## 2. TO OR FOR THE BENEFIT OF A CREDITOR

■ Navaro urges that because the notes were discounted prior to the preference period, it was not the recipient of Candor's payment and the transfers were not to or for the creditor's benefit. We reject that argument, however, because the discounting did not alter Navaro's continued position as creditor of the note's maker. *See generally In re Lyon*, 121 F. 723 (2d Cir.1903); 11 U.S.C. § 101(9). As an endorser of the notes, Navaro was a creditor under the Bankruptcy Code holding a contingent claim against the debtor. Payment of the notes eliminated Navaro's liability to Bank Leumi and, in turn, Candor's liability to Navaro. Thus, assuming all other elements are met, the payments constituted preferences. *McColley v. Matmon Gem Co., Inc. (In re Candor Diamond Corp.)*, 44 B.R. 195, 198 (Bankr.S.D.N.Y. 1984); 4 L. King, *Collier on Bankruptcy*, ¶ 547.18 at 547–62–63 (15th ed. 1984).

## 3. FOR OR ON ACCOUNT OF AN ANTECEDENT DEBT

■ Clearly the Second and Fourth transactions, where checks were issued, were on account of antecedent debts because the checks were issued months after the gems were sold and delivered. The use of notes in the First and Third transactions does not, however, as Navaro urges, render them substantially contemporaneous. Even if the notes were given upon delivery of the goods (the parties have only stated when the notes were paid), the contemplated delay inherent in payment of a note renders the exchange one which is not contemporaneous. *In re Candor Diamond, supra*, 44 B.R. at 197. The lack of contemporaneity is particularly evident here where the notes were paid months after the goods were delivered. Thus, all the transfers at issue were on account of antecedent debts.

## 4. WHILE THE DEBTOR WAS INSOLVENT

Under section 547(f), the debtor is presumed to be insolvent during the 90–day preference period. That presumption, as mandated by Fed.R.Evid. 301 made applicable in bankruptcy proceedings by Fed.R. Bankr.Pro. 9017, "requires the party against whom the presumption exists to come forward with some evidence to rebut the presumption, but the burden of proof remains on the party in whose favor the presumption exists." H.Rep. No. 95–595, 95th Cong. 1st Sess. 375 (1977), U.S.Code. Cong. & Admin.News 1978, pp. 5787, 6331; *See* 4 L. King, *Collier on Bankruptcy* ¶ 547.26 at 547–109 (15th ed. 1985); *In re Emerald Oil Co.*, 695 F.2d 833 (5th Cir. 1983); *Keydata Corporation v. Boston Edison Co. (In re Keydata Corp.)*, 37 B.R. 324, 327 (Bankr.D.Mass.1983). Specifically, "the burden of proof in the sense of the risk of nonpersuasion remains on the party in favor of whom the presumption operates." *Clay v. Traders Bank*, 708 F.2d 1347, 1351 (8th Cir.1983).

Several courts have explored what exactly constitutes "some evidence" rebutting the insolvency presumption. In *Keydata Corp.* the court found the defendant did not meet its burden of coming forward with some evidence where the defendant showed only that the debtor was current on its bills but not that the value of the assets exceeded that of the liabilities. *Id.* 37 B.R. at 327. Again, the defendant/creditor was unsuccessful in *Mazer v. Aetna Finance Company (In re Zuni)*, 6 B.R. 449, 451 (Bankr.D.N.M.1980) where he only sought to attack the value of the property as reflected in the petition. *See also Pippin v. John Deere Company (In re Pippin)*, 46 B.R. 281, 284 (Bankr.W.D.La.1984) (purchase statement prepared more than five months prior to the filing for relief insufficient to rebut insolvency presumption). In another case, an unverified "operating report" which reflected assets slightly in excess of liabilities was proffered to meet the "some evidence" test. However, at trial,

the accuracy of that report was entirely negated both by the financial condition of the debtor upon the filing of the chapter 7 petition some three months later and by the testimony of the owner/president of the debtor. Thus, the insolvency presumption was not rebutted. *Lancaster v. City and County Bank of Washington County (In re Tuggle Pontiac-Buick-GMC, Inc.)*, 31 B.R. 49 (Bankr.E.D.Tenn.1983). That decision comports with *In re Villars*, 35 B.R. 868 (Bankr.S.D.Ohio 1983) where the court stated that defendant's evidence must be "competent evidence ... as to the valuation of Debtors' assets or as to the amount of creditors' claims in order to meet the minimum test of the 'bursting bubble' theory." *Id.* at 873.

The Fifth Circuit, too, has struggled with determining how much evidence is sufficient to overcome the presumption. *In re Emerald Oil Co.*, 695 F.2d 833 (5th Cir. 1983), the creditor offered evidence through an accountant not familiar with the debtor's books and records who criticized the trustee's accountant as possibly having employed an improper accounting method. The Fifth Circuit found that the "*potential* error in accounting methods relied on by the trustee" was insufficient evidence to meet or rebut the insolvency presumption. *Id.* at 838. *See generally New York Credit Adjustment Bureau, Inc. v. Just In-Materials Designs, Ltd. (In re Vasu Fabrics, Inc.)*, 39 B.R. 513, 516 (Bankr.S.D.N.Y.1983) (pure speculation by a creditor is insufficient to rebut insolvency presumption).

■ In the case at bar, to overcome the presumption Navaro proffered Yurman's testimony which was based on a review report consisting of unaudited financial statements reflecting a small excess of assets over liabilities. Yurman did not himself prepare the report but supervised its preparation. The numbers were derived entirely from the debtor's principal and bookkeeper.

Unaudited financial statements, although they may not be the best evidence, have been admitted by courts as evidence of solvency. *See Abdo v. Townshend*, 282 F. 476 (4th Cir.1922) (holding admissible the unaudited financial statement and stating that "[the] statement was not complete or accurate, but what it showed bore more or less directly on the financial condition of the bankrupts at the time they transferred the property in question to the defendants." *Id.* at 480. The *Townshend* court found the testimony competent and left to the jury the determination of its value; *Braunstein v. Massachusetts Bank and Trust Co.*, 443 F.2d 1281 (1st Cir.1977) (unaudited financial statement prepared by accountant but not verified as to validity of assets and liabilities was admissible as "the best available evidence." *Id.* at 1284; *Consove v. Cohen (In re Roco Corp.)* 701 F.2d 978, 8 C.B.C.2d 457 (1st Cir.1983) (affirmed finding that debtor was insolvent based on expert testimony and unaudited financials because the accuracy of the financial statements is for the trier of fact to assess); *Chaitman v. Paisano Automotive Liquids, Inc. (In re Almarc Manufacturing, Inc.)* 60 B.R. 584, 14 Bankr.Ct. Dec. 466 (Bankr.N.D.Ill.1986) (unaudited financial statement showing a very significant positive net worth 5 months before bankruptcy and 60 days before transfer sufficient to rebut presumption of insolvency, notwithstanding affidavit of accountant who prepared statement in which he states that receivables and inventory are overstated substantially); *Tidwell v. Merchants & Farmers Bank (In re Dempster)*, 59 B.R. 453 (Bankr.M.D.Ga.1984) (financial statement predating bankruptcy by 18 months together with evidence of bank accounts with positive net worth and continuation in business insufficient to rebut presumption of insolvency).

In weighing Navaro's evidence we find it to be insufficient to meet or rebut the insolvency presumption. The review report loses some weight because the financials are unaudited and cover a period which pre-dated each of the transfers by between five and one-half to nine months. Scrutiny of the numbers contained in the report and the manner in which they were compiled

detracts further from the report's credibility. Yurman vaguely testified that he "made various inquiries into the receivables ... [and] did various tests to the receivables and comparison and procedures." What that means is anyone's guess. He was clear though that these "tests" and "procedures" did not include actual examination of the inventory nor communication with the account debtors notwithstanding that the accounts receivable and inventory are the lion's portion of the debtor's assets. Paragraph 27(c) of the Standards for Accounting Review Services in connection with the compilation and review of financial statements provides so far as germane that the accountant's inquiry and analytical procedures should ordinarily consist of ... "(1) comparison of the financial statements with statements for comparable prior period(s), (2) comparison of the financial statements with anticipated results, if available (for example, budgets and forecasts), and (3) study of the relationships of the elements of the financial statements that would be expected to conform to a predictable pattern based on the entity's experience." Although the accountant testified that he inquired of Candor whether it utilized generally accepted accounting principles he did not indicate whether or not the review embraced the comparisons and study described in Paragraph 27(c). It is particularly noteworthy that he apparently did not question the significant increase in inventory from $467,028 on November 30, 1979 to $1,345,528 on November 30, 1980.

Yurman's testimony that he relied on Irwin Margolies for much of the information embodied in the report casts greater doubt on the reliability of the financial statements. So much of the Trustee's deposition as was admitted into evidence reveals that he believes that Margolies and his wife defrauded the estate and that the estate therefore has a claim of in excess of six million dollars against each of them. Further, without considering the truthfulness of the facts asserted in Margolies' allocution, we take judicial notice that Margolies was indicted and convicted on fraud related criminal activities associated with Candor. *See Ives Laboratories, Inc. v. Darby Drug Co.,* 638 F.2d 538, 544 n. 8 (2d Cir.1981), *rev'd on other grounds sub nom. Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982); *E.I. DuPont De Nemours & Co., Inc. v. Cullen,* 791 F.2d 5, 7 (1st Cir.1986); *Green v. Warden, U.S. Penitentiary,* 699 F.2d 364 (7th Cir.), *cert. denied,* 461 U.S. 960, 103 S.Ct. 2436, 77 L.Ed.2d 1321 (1983); *St. Louis Baptist Temple, Inc. v. Federal Deposit Insurance Corporation,* 605 F.2d 1169, 1172 (10th Cir.1979).

For all of the reasons described above, we do not believe that Navaro has come forward with sufficient evidence to rebut the presumption that Candor was insolvent some five and half to nine months after the date of the financial statements, when the transfers were made.[5]

## 5. ON OR WITHIN 90 DAYS BEFORE THE FILING OF THE PETITION

Because we have determined the relevant transfers for preference purposes to have been when the notes were paid, and because the parties stipulated to the dates of payment by check and note, no issue exists with respect to this element of the Trustee's case.

## 6. CREDITOR RECEIVED MORE THAN IT WOULD HAVE FROM THE LIQUIDATION

■ To establish a preferential transfer requires the trustee to show that the credi-

---

**5.** Navaro urges that we should project the solvency which the financial statements reflect as of November 30, 1980 to the times when the transfers were made, analogizing to the permitted retrojection by which a later finding of insolvency is read into an earlier period if there is evidence that there was no change in financial condition. *See Braunstein v. Massachusetts* *Bank & Trust Company,* 443 F.2d 1281, 1284 (1st Cir.1971); *Hassan v. Middlesex County National Bank,* 333 F.2d 838, 840 (1st Cir.), *cert. denied,* 379 U.S. 932 (1964). Assuming for the sake of argument the propriety of such a projection, we decline to so project because we have concluded that the evidence of solvency is unconvincing.

tor received more than he would have had the transfer not been made, had the case been one under chapter 7 and had the creditor received payment only to the extent provided by the Code. 11 U.S.C. § 547(b)(5). As the Trustee correctly points out, whether or not a transfer meets the statutory requirement of § 547(b)(5) requires construction of a hypothetical distribution of the bankrupt estate. *In re Tenna Corporation*, 801 F.2d 819, Bankruptcy Law Report (CCH) ¶ 71,466 (6th Cir.1986); *Pereira v. United States (In re Rodriquez)*, 50 B.R. 576, 583 (Bankr.E.D.N.Y. 1985). The costs of administration of the debtor's estate are to be taken into account in making the required analysis. *Tenna, supra*, 801 F.2d 819, ¶ 71,466 at 89,907; *In re Independent Clearing House Co.*, 41 B.R. 985, 1013 (Bankr.D.Utah 1984), *aff'd.*, 62 B.R. 118 (D.Utah 1986). As a practical matter, this element of a preference is almost always satisfied where a debtor transfers property to an unsecured creditor, such as Navaro, and the creditor would receive less than 100% in a Chapter 7 liquidation. *Barash v. Public Finance Corp.*, 658 F.2d 504, 508–09 (7th Cir.1981); *Demetralis v. Golden Guernsey, Inc. (In re Demetralis)*, 57 B.R. 278 (Bankr.N.D.Ill. 1986).

The parties agree that if the Trustee's "six millions plus" claim against Irwin and Madeleine Margolies is not included in the computation of the estate's assets, the estate is not solvent and Navaro could not receive 100% of its claim from the estate. (See Point II of Navaro's Memorandum of Law and paragraphs 3 through 6, inclusive, of its proposed findings of fact and conclusions of law). As the Trustee's deposition reveals, the liquid assets in his possession at that date totaled $718,112.58, of which $186,723.00 was being held in escrow pending the outcome of litigation; John P. Ma-

guire & Company filed a secured claim of $5,669,394.98; and the unsecured creditors filed claims of under $500,000.00. Under Fed.R.Evid. 201, we are permitted to take judicial notice of our own orders and, in so doing, note that administration expenses awarded to date exceed $300,000 and are continuing to mount. Thus, the liabilities of the estate are somewhere in the area of at least $6.3 million.

■ As explained in *In re Independent Clearing House Co.*, *supra*, 41 B.R. at 1013, although it is not always possible to construct a mathematically precise hypothetical distribution to demonstrate what the creditors will likely receive, this is not necessarily a bar to recovery of an otherwise avoidable transfer. Because we disagree with Navaro's argument that the claim against the Margolies is properly includable as an asset, we conclude that a diminution of the estate occurred.

■ The mere possibility that a trustee may ultimately realize a large recovery on a claim which as of the time he assails the preference he has not even asserted is not, in our opinion, sufficient to bring that claim within the ambit of "assets" for purposes of the "recover more" analysis. As noted in *Tidwell v. Fickling & Walker Insurance Agency, Inc. (In re Georgia Steel, Inc.)*, 58 B.R. 153, 157 (Bankr.M.D.Ga. 1984), to include such claims as assets would make it impossible for a trustee to recover a preference; the court would effectively be required to try all sizeable contingent claims before it could try any preference action. *Accord Derryberry v. Peoples Banking Company, (In re Hartley)*, 55 B.R. 770, 777 (Bankr.N.D.Ohio 1985).

Navaro aptly directs our attention to the definition of "insolvent" contained in Section 101(29) of the Code.[6] That definition

---

6. 11 U.S.C. § 101(29) so far as pertinent provides:
"insolvent means—
(A) with reference to an entity other than a partnership, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—

(i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and
(ii) property that may be exempted from property of the estate under section 522 of this title; ...

utilizes a "balance sheet" test to determine solvency, that is, we look to whether the entity's debts exceed its property, fairly valued. The same test was utilized under the former Bankruptcy Act. And the preference cases under the Act, where insolvency had to be proven,[7] were uniform in holding that contingent or inchoate claims are not included as part of the bankrupt's property, *Penn v. Grant*, 244 F.2d 309 (9th Cir.), *cert. denied*, 355 U.S. 837, 78 S.Ct. 58, 2 L.Ed.2d 47 (1957); *In re Block*, 109 F. 790 (2d Cir.1901); *Allegaert v. Chemical Bank*, 418 F.Supp. 690, 692 (E.D.N.Y.1976); *In re Bichel Optical Laboratories, Inc.*, 299 F.Supp. 545 (D.Minn.1969), unless the claims are such that they may be rendered available for the payment of the bankrupt's debts within a reasonable period of time. *Mossler Acceptance Co. v. Martin*, 322 F.2d 183 (5th Cir.1963), *cert. denied*, 376 U.S. 921, 84 S.Ct. 679, 11 L.Ed.2d 616 (1964); *Syracuse Engineering Co. v. Haight*, 110 F.2d 468, 471 (2d Cir.1940); *Allegaert, supra*, 418 F.Supp. at 692; *Bichel Optical, supra*, 299 F.Supp. 546–47. We see no reason why the analysis should not be applied to both the tests for insolvency and greater recovery under the Code. *See Brent Explorations, Inc. v. Karst Enterprises, Inc. (In re Brent Explorations, Inc.)*, 31 B.R. 745, 751–52 (Bankr.D.Col.1983); *Belfance v. Banc-ohio/National Bank (In re Gastaldo)*, 13 B.R. 808 (Bankr.N.D.Ohio 1981); *Sapir v. Eli Haddad Corp. (In re Coco)* 60 B.R. 365, 372 n. 9 (Bankr.S.D.N.Y. Nov. 21, 1986); *Hartley, supra*, 55 B.R. at 777.

 Here, since the Trustee had not at the time of his deposition even commenced any actions to recover the claims against the Margolies and further, since Margolies himself is a chapter 7 debtor, a fact which we may judicially notice, we can easily conclude that the likelihood of full recovery is highly speculative at best and certainly unlikely within a reasonable period of time. Accordingly, we hold that the transfers received by Navaro were preferential.[8] If the Trustee is ultimately able to recover on his claim in an amount sufficient to permit a 100% distribution to unsecured creditors, Navaro will receive payment in full on its claim resulting from recovery of any preferences. *Georgia Steel, supra*, 58 B.R. at 157; *Brent Explorations, supra*, 31 B.R. at 752; *Gastaldo, supra*, 13 B.R. at 810.

SETTLE ORDER FOR JUDGMENT ON NOTICE.

---

7. Under prior law, former 11 U.S.C. § 96, no presumption of insolvency existed.

8. Defendant urges upon us a partial affirmative defense—that the promissory notes comprising the First and Third Transactions were given to Navaro as contemporaneous exchanges for new value and, as such, are protected under 11 U.S.C. § 547(c)(1). We note first, as did the Trustee, that this defense was not raised in Navaro's answer but emerged in its post-trial submission. This aside, however, we are not impressed with the defense. As discussed in the text in conjunction with the antecedent indebtedness element of the Trustee's action, the delay in payment inherent in a promissory note renders the exchange one which is not intended to be contemporaneous, notwithstanding the immediate discounting of the note with a bank. *See McColley v. Matmon Gem Co., Inc., (In re Candor Diamond Corp.)*, 44 Bankr. 195 (Bankr. S.D.N.Y.1984).